UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JAMAL GWYNN,<br><br>                            Plaintiff,<br>      v.<br>PATRICK SHERWOOD,<br><br>                           Defendant. | Case No. 3:18-cv-00129-MMD-WGC<br><br>ORDER |

**I.    SUMMARY**

In this case, brought under 42 U.S.C. § 1983, *pro se* Plaintiff Jamal Gwynn maintains a single Fourth Amendment excessive force claim against Defendant Patrick Sherwood. (ECF No. 3 at 4.) Sherwood has moved for summary judgment on the claim ("Motion") (ECF No. 35). For the reasons stated below, the Court will grant the Motion.[1]

**II.    BACKGROUND**

The following facts are undisputed.[2],[3]

This case arises from events which occurred on the night of May 6, 2016. (ECF No. 35-3 at 3.) That night, at approximately 10:30 p.m., Kierra Jemison arrived home after running errands with her three children and parked in her garage. (*Id.*) A man, later

///

---

[1]The Court has also considered Gwynn's response (ECF No. 48) and Sherwood's reply (ECF No. 50).

[2]Gwynn was afforded additional time to fully respond to the Motion after failing to respond within the initial timeframe. (ECF Nos. 46, 47.) However, Gwynn's response is minimal and fails to dispute any fact, material or otherwise, stated in the Motion. (*See.* ECF No. 48.) The Court does note *infra* certain differences in facts that derive from Gwynn's complaint and evidence in the record.

[3]Sherwood was scheduled to depose Gwynn on April 4, 2019 (ECF No. 49-1) but Gwynn claims that he was unable to be present for deposition because his prison residence was on lock down (ECF No. 49). Gwynn also claims that "daily lock down[s]" have made it "impossible" for him to use the law library. (*Id.*)

1 | identified as Gwynn, approached her car door and told her to get out. (*Id.*) In shock, she
2 | responded "What[?]" (*Id.*) Gwynn then cocked his gun and told her repeatedly to "get out
3 | of the car." (*Id.*) Jemison told her children to get out of the car. (*Id.* at 3–4.) She too exited
4 | the car with her hands up and rushed inside her home with her children. (*Id.*) Gwynn took
5 | the car. (*Id.* at 4.) Because Jemison did not feel safe at home she immediately ran to her
6 | neighbor's house with her children and called the police. (*Id.*) Jemison's neighbor had
7 | seen the car leave but assumed Jemison had been driving. (*Id.*)

The Las Vegas Metropolitan Police Department's ("LVMPD") Northwest Area Command responded to Jemison's call. (ECF No. 35-1 at 9.) Officer James LaRosa arrived on scene and began interviewing Jemison. (*Id.*; *id.* at 11.) Sherwood then arrived. (*Id.* at 9.) Sherwood asked Jemison for a description of the suspect and the direction he traveled. (ECF No. 35-4 (grand jury transcript) at 27; ECF No. 35-6 at 8.) Jemison reported that Gwynn had stolen her white 2016 Chevrolet Malibu. (ECF No. 35-4 at 28.) While the officers interviewed Jemison, Jemison's neighbor brought Jemison's son over to speak with the officers. (*Id.* at 29; ECF No. 35-6 at 9.) Jemison's son provided a description of the suspect—"a black male adult wearing a black baseball cap, black shorts and a black shirt." (ECF No. 35-6 at 9.) Jemison, her son, and the neighbor agreed that Gwynn drove southbound. (*Id.*)

Sherwood decided to attempt to locate the suspect, driving in a patrol car. (ECF No. 35-1 at 9.)[4] As Sherwood searched for Jemison's car, Onstar—a vehicle communication system intended for emergencies—informed LVMPD dispatch that the car's global positioning system (GPS) indicated that the car was at an apartment complex nearby. (*Id.*) OnStar engaged the ignition block on Jemison's car and activated the lights and horn. (*Id.*) Sherwood had noticed the car moments before and alerted dispatch. (ECF No. 35-6 at 9.) He made a U-turn to enter the apartment complex and ultimately observed the car rolling backwards. (*Id.*) Sherwood was not aware that OnStar had disabled the car,

///

---

[4] At the time Sherwood was a motorcycle officer. (ECF No. 35-6 at 8.) He checked out a patrol car that day because it had been raining. (*Id.*)

2

but believed Gwynn had. (*Id.*; *id.* at 11.) Sherwood entered the apartment's gate after other persons entered the apartment gate code. (*Id.* at 9; ECF No. 35-1 at 9; ECF No. 35-5 at 4.) Both Sherwood and the other vehicle entered the apartment complex. (ECF No. 35-1 at 9; ECF No. 35-5 at 4; ECF No. 35-5 at 1 (Exh. D) at 00:43–00:57.)

Sherwood parked his patrol car a few feet from the stolen car, but left it running. (ECF No. 35-6 at 10; ECF No. 35-1 at 9; ECF No. 35-5 at 1 (Exh. D) 00:59–01:03.) As Sherwood exited his vehicle, he saw Gwynn, who matched the description of the suspect, exiting the Malibu. (*Id.*) Sherwood drew his service weapon because of the information that Gwynn was carrying a weapon and identified himself as police.[5] (*Id.*) He ordered Gwynn to get on the ground. (*Id.*) Gwynn raised his hand as if he was about to comply, but then ran away. (ECF No. 35-5 at 1 (Exh. D) 01:03–01:15.) As Gwynn was exiting the car, Sherwood had heard the sound of metal hitting the ground and thought it was from shell casings hitting the ground. (ECF No. 35-6 at 10.) Sherwood also saw a firearm in Gwynn's hand. (*Id.*; ECF No. 35-1 at 9.) Gwynn ignored Sherwood's repeated orders to get on the ground and to drop the gun. (ECF No. 35-6 at 10.) Instead, Gwynn ran toward the apartment complex. (*Id.*) Sherwood pursued him. (*Id.*)

While chasing Gwynn, Sherwood could no longer see a gun in his hand. (*Id.*) Sherwood nonetheless thought Gwynn still had the gun because he could see Gwynn's hand moving near his waist area. (*Id.*) Sherwood explains that he believed he needed to apprehend Gwynn because he believed he was still armed, and he was heading towards a populated area. (*Id.*) He was concerned that citizens could be harmed in the complex if a "gun battle" ensued. (*Id.* at 11.) Indeed, the individuals who had entered the complex following Sherwood remained in the immediate vicinity. (*See, e.g.*, ECF No. 35-5 at 13, 20 (witness explaining that Gwynn was running "towards us" and that Sherwood said "Stay here, don't go anywhere").)

///

///

---

[5] In addition to driving a marked patrol car, Sherwood was wearing uniform. (ECF No. 35-6 at 10.)

3

At some point during the chase, Gwynn fell to the ground. (ECF No. 35-5 at 13; ECF No. 35-6 at 11; ECF No. 35-2 at 11.) In his complaint (ECF Nos. 1-1, 4), Gwynn claims he surrendered to Sherwood and that he ran again after Sherwood unnecessarily kicked him in the ribs, groin and head. (ECF No. 1-1 at 4.) Sherwood and an eyewitness ("Witness 1") indicate that Gwynn tripped. (ECF No. 35-6 at 11; ECF No. 35-2 at 11.) Sherwood explained that believing Gwynn was still armed, he kicked him in the head to keep him from accessing the gun he believed he had in his waist and to prevent further incident. (ECF No. 35-6 at 11.) However, within a few seconds Gwynn jumped up and started running further into more populated area. (*Id.*) Another witness ("Witness 2") thought Gwynn was running towards him and his companion—Witness 1—and pulled out a pocketknife to try and protect himself. (ECF No. 35-5 at 9–10; 20–21; ECF No. 35-2 at 10.) Gwynn ultimately ran into Sherwood's patrol car. (ECF No. 35-5 at 16–17; ECF No. 35-6 at 11; ECF No. 1-1 at 4; ECF No. 35-5 at 1 (Exh. D) 01:53–01:58.)

About five seconds past between when Gwynn got into Sherwood's car and when Sherwood shot at Gwynn. (ECF No. 35-5 at 1 (Exh. D) 01:53–01:58; *see also* ECF No. 35-6 (sentencing memo from Gwynn's ultimate prosecution provides that Sherwood shot Gwynn "almost immediately" upon Gwynn entering the patrol car).) Nonetheless, Sherwood details that Gwynn began pulling on a shotgun that was mounted near the driver seat as soon as he entered the patrol car. (ECF No. 35-6 at 11.) Witness 2 explained that he heard Sherwood yelling "Don't do it. Don't do it" and "Get out of the car." (35-5 at 17; ECF No. 35-2 at 10.) Gwynn ignored Sherwood's commands. (ECF No. 35-6 at 12.) Sherwood claims that he then watched Gwynn reach into the front passenger seat where he believed there was a backup handgun when Gwynn raised his hand toward Sherwood and pointed an object at him. (*Id.*) Sherwood notes that, at this point, thinking his life and

///
///
///
///

4

the lives of others in the area were in danger, Sherwood shot Gwynn multiple times. (*Id.*)[6], [7]

After shooting Gwynn Sherwood ordered him to exit the patrol car. (ECF No. 35-6 at 12.) Sherwood claims that Gwynn did not exit, but instead said "Fuck you," and rapidly reversed the car. (*Id.*) Video evidence shows that the patrol car remained still for approximately 37 seconds after Sherwood shot Gwynn and before Gwynn began to reverse. (ECF No. 35-5 at 1 (Exh. D.) 01:57–02:35.) Gwynn then turned the car around and drove toward Sherwood. (*Id.* at 02:35–02:43; ECF No. 35-6 at 12.) Both Sherwood and Witness 2 thought Gwynn was trying to hit Sherwood with the car. (*Id.*; ECF No. 35-3 at 19–20, 22.) Sherwood shot at the car again multiple times, but Gwynn drove off, ramming the car through the exit gates and leaving the apartment complex. (ECF No. 35-5 at 1 (Exh. D.) at 02:40–02:54; ECF No. 35-6 at 12; ECF No. 35-5 at 20.)

Gwynn was ultimately apprehended with the assistance of LVMPD's air unit and taken to the hospital. (ECF No. 35-1 at 9.) Gwynn's medical examination revealed that he sustained a gun graze wound to his left shoulder and two gunshot entry wounds to his left chest just below the left nipple. (*Id.* at 11.) He also had two fractured ribs, a fractured sternum, and bruised lungs. (*Id.*) Gwynn later pleaded guilty to one count of robbery with use of a deadly weapon under NRS §§ 200.380, 193.165, and one count of battery with use of a deadly weapon, in violation of NRS § 200.481. (ECF No. 35-5 at 24.)

Gwynn filed this lawsuit against LVMPD and Sherwood in March 2018. (ECF Nos. 1, 3, 4.) LVMPD was dismissed from the case. (ECF No. 3 at 6.)[8] Gwynn was allowed to

///

///

---

[6]The record reflects that Sherwood shot Gwynn three or four times. (ECF No. 35-2 at 10; ECF No. 35-1 at 9; ECF No. 35-6 at 12; ECF No. 35-5 at 13.) Sherwood was roughly three or four feet from Gwynn at the time. (*E.g.*, ECF No. 35-2 at 10.)

[7]While Sherwood claims he aimed his shots "low" (ECF No. 35-6 at 12), Witness 2 provides that Sherwood shot right at Gwynn (ECF No. 35-5 at 19).

[8]Gwynn was permitted leave to amend his claim against LVMPD (ECF No. 3 at 5–6) but did not do so (*see generally* docket).

5

proceed with the single Fourth Amendment excessive force claim against Sherwood. (*Id.* at 4, 6.)

## III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. Moreover, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

///

///

6

## IV. DISCUSSION[9]

Based on Gwynn's complaint, Gwynn specifically claims that Sherwood used excessive force in violation of the Fourth Amendment when Sherwood kicked him while he was down and then shot Gwynn multiple times because Sherwood's life was not in danger. (ECF No. 1-1 at 4.) In the Motion, Sherwood argues that he committed no constitutional violation because he was either justified in using the force he did (including deadly force) *or* entitled to qualified immunity for using such force (ECF No. 35). As the Court noted, Gwynn does not meaningfully contest the facts as articulated by Sherwood in the Motion. At most, in his responsive brief, Gwynn reiterates his position that Sherwood's use of force was unlawful, claiming he was trying to surrender, which the Court finds is only relevant to the alleged kicks. (*Compare* ECF No. 1-1 at 4 *with* ECF No. 48 at 2.) Gwynn also claims that Sherwood's actions were negligent (ECF No. 48 at 1–2), which is beyond the claim and issues presently before the Court.[10] Considering the applicable caselaw, the Court concludes that Sherwood is entitled to qualified immunity.

Section 1983 provides a mechanism for the private enforcement of substantive rights conferred by the Constitution and federal statutes. *Graham v. Connor,* 490 U.S. 386, 393–94 (1989). To prevail on a claim under § 1983, a plaintiff must prove that (1) the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived him of a federal constitutional or statutory right. *Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir. 1989). Here, it is undisputed that Sherwood was

///

///

---

[9]Both Gywnn and Sherwood were sent a copy of a CD which Gwynn's mother directly submitted to the Court as video evidence. (ECF Nos. 44, 47.) While the parties appear to agree that the Court should consider this evidence in deciding the Motion (*e.g.*, ECF No. 48 at 2; ECF No. 50 at 3), the evidence has not been authenticated and therefore the Court will not consider it in its analysis here. Further, to the extent the CD documents the shooting, it is largely duplicative of Sherwood's exhibit D (reflected at ECF No. 35-5 at 1).

[10]*See, e.g., Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

7

acting under color of state law. Further, Gwynn relies on substantive rights conferred by the Fourth Amendment. Thus, Gwynn has stated a claim under § 1983.

Given Gwynn's claim, Sherwood is entitled to assert the affirmative defense of qualified immunity, as he does here. *See, e.g.*, *Spoklie v. Montana,* 411 F.3d 1051, 1060 (9th Cir. 2005) ("State officials have qualified immunity from civil liability under § 1983 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.""). The Court conducts a two-step inquiry to determine whether an officer is entitled to qualified immunity. *See, e.g.*, *Groves v. City of Reno*, No. 3:13-cv-00537-MMD-WGC, 2015 WL 5350099, *4 (D. Nev. Sept. 14, 2015). First, the Court decides "whether the facts shown make out a violation of a constitutional right." *Id.* If the Court finds a constitutional violation, the Court then decides "whether the constitutional right was clearly established as of the date of the alleged misconduct." *Id.* (citations omitted). "The Supreme Court has instructed that district judges may use their discretion in deciding which qualified immunity prong to address first based on the circumstances of the case at issue." *Id.* (citing *Pearson v. Callahan,* 555 U.S. 223 at 232, 236 (2009)). The Court discusses both prongs.

### 1. Whether the Facts Establish a Violation of Gwynn's Fourth Amendment Rights

The Court examines the objective reasonableness of Sherwood's conduct to determine whether he has violated Gwynn's constitutional rights. Specifically, the Court determines whether Sherwood's use of force was excessive under the Fourth Amendment by assessing whether it was objectively reasonable "in light of the facts and circumstances confronting [Sherwood], without regard to [his] underlying intent or motivation." *Graham,* 490 U.S. at 397. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). In this analysis, the Court must consider the following factors:

(1) the severity of the crime at issue; (2) whether Gwynn posed an immediate threat to the safety of the officer or others; and (3) whether Gwynn actively resisted arrest.[11] *Id.; see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F .3d 912, 921 (9th Cir. 2001). The Court must also account for the reality that police officers make quick decisions in high-stress situations. *Graham,* 490 U.S. at 396. Hence, even a mistaken belief that a suspect is armed may be reasonable in some circumstances. *See Lamont v. New Jersey,* 637 F.3d 177, 183 (3d Cir. 2011) ("[A]n officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable.").[12] However, there must be objective factors justifying an officer's safety concerns. *Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir. 2001).

Again, based on the complaint and Gwynn's sparse responsive brief the Court gathers that Gwynn's position is that Sherwood's actions in kicking him and later shooting him was objectively unreasonable, contending that he was attempting to surrender. As an initial matter, the video evidence before the Court in no way supports that Gwynn was attempting to surrender relative to his being shot, therefore Gwynn's argument is not relevant to that issue. With regard to Sherwood kicking Gwynn, Sherwood disputes Gwynn's assertions of the extent of his kicks. (*See* ECF No. 35-6 at 11 (contesting Gwynn's assertion that Sherwood kicked him in the head *and* ribs).) Moreover, Sherwood contends that even if he kicked Gwynn, as Gwynn asserts, he was justified in doing so in order to subdue Gwynn, who was a fleeing and dangerous suspect. (ECF No. 35 at 24.) Sherwood further argues that his use of deadly force was reasonable because, in addition to being a fleeing-dangerous suspect, Gwynn had access to guns and Sherwood believed

///

///

---

[11]While these factors act as guidelines, "there are no per se rules in the Fourth Amendment excessive force context." *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

[12]*But see Torres v. City of Madera,* 648 F.3d 1119, 1124 (9th Cir. 2011) ("Not all errors in perception or judgment, however, are reasonable . . . nor does the Constitution forgive an officer's every mistake.").

9

Gwynn pointed a gun at him upon taking control of Sherwood's patrol car as well as presented a danger to others. (*E.g.*, *id.* at 23–25.)

The Court finds that the *Graham* factors weigh in favor of finding that Sherwood's use of force—in both kicking and shooting Gwynn—was not objectively unreasonable. The Court easily resolves the first and third factors in favor of finding reasonableness. Here, the underlying crime, to which Gwynn pleaded guilty, is robbery with a deadly weapon. The evidence also supports that Gwynn actively resisted arrest. To be sure, beyond Gwynn's basic statements in the complaint and responsive brief, there is no evidence in the record that Gwynn attempted to surrender to Sherwood. The evidence noted *supra* is to the contrary. Notably, both Sherwood and Witness 1 indicate that Gwynn merely tripped and then shortly thereafter continued to run again.[13]

The second *Graham* factor—whether Gwynn posed an immediate threat to the safety of Sherwood and others—solidifies the Court's conclusion that Sherwood's conduct was objectively reasonable. *See, e.g.*, *Gonzalez v. City of Anaheim,* 747 F.3d 789, 794 (9th Cir. 2014) ("The immediacy of the threat posed is the most important factor."). At the time of the foot pursuit Sherwood had been informed that Gwynn had a gun and had robbed Jemison at gunpoint while she was with her children. Sherwood also saw Gwynn with the gun in his hand shortly before the foot pursuit ensued and believed Gwynn had the gun with him during the entire pursuit. It has also been established that other individuals were present in the immediate area of the ongoing pursuit. It was therefore reasonable for Sherwood to both believe that Gwynn was carrying a weapon on him and that he was an immediate danger to both Sherwood and others.

Given these facts, the caselaw supports that Sherwood was justified in using force—including deadly force—even if he was mistaken about Gwynn actually having the

///

---

[13]The video evidence shows Gwynn running from Sherwood at all relevant times. As Sherwood notes, there is about 28 seconds when neither Gwynn nor Sherwood is visible (ECF No. 35-5 at 1 (Exh. D.) 01:12–01:40). Even if the Court accepts that Gwynn surrendered in the manner he describes in the complaint (ECF No. 1-1 at 4), while also being kicked as Gwynn describes (*id.*) during this period of time, the Court agrees with Sherwood that such surrender would be "practically ineffectual" (ECF No. 35 at 24).

10

gun on his person at the time. *See supra Lamont*, 637 F.3d at 183; *see also Tennessee v. Garner*, 471 U.S. 1, 3 (1985) (providing that officers are permitted to use deadly force where necessary to "prevent a suspect's escape who poses a significant threat of death or serious physical injury to the officer or others"); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (collecting deadly force cases). Importantly here, Sherwood did not use deadly force (shooting) until after Gwynn took control of Sherwood's patrol car—demonstrating Gwynn's determined intention to immediately and speedily flee. And, although only several seconds passed before Sherwood shot at Gwynn, Gwynn does not dispute any of Sherwood's related contentions. These contentions include that Gwynn reached for weapons in the patrol car and that he raised an object toward Sherwood that Sherwood believed was a weapon. Of course, the Court must recognize that all this occurred (or was at minimum perceived) in a high-stressed situation. The lack of any challenge to Sherwood's assertions forces a finding squarely in favor of Sherwood on the issue of whether his exercise of force was reasonable.[14] The Court concludes that Sherwood's use of force was reasonable and thus Sherwood did not violate Gwynn's Fourth Amendment rights.

### 2. Was the Fourth Amendment Violation Clearly Established

Even if it could be concluded that Sherwood's use of force was objectively unreasonable and therefore unconstitutional, the Court concludes that the second prong of the qualified immunity analysis falls in favor of Sherwood.

The second prong of the analysis requires the Court to determine whether the law, as it existed at the time of the incident, was clearly established. "A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741

///

---

[14]Sherwood's version of the noted facts is also reasonably supported by Witness 2 statements that he heard Sherwood yelling "Don't do it. Don't do it" after Gwynn entered the patrol car. (35-5 at 17; ECF No. 35-2 at 10.)

(2011) (quotation marks and citation omitted). The Supreme Court has cautioned courts "not [to] define clearly established law at a high level of generality." *Id.* at 742 (citations omitted). Yet, it is "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).

Here, the situation is not obviously novel. Gwynn was a fleeing-felony suspect, who Sherwood had every reason to believe possessed a deadly weapon and posed an immediate threat to Sherwood and others. The Court cannot conclude, based on the facts presented which Gwynn does not meaningfully dispute, that any reasonable officer—standing in Sherwood's position—would have been on notice that the alleged violating conduct was inconsistent with clearly established law.

The Court therefore finds that Sherwood has established that he is entitled to assert qualified immunity as an affirmative defense to Gwynn's Fourth Amendment excessive force claim. The Court will thus grant the Motion (ECF No. 35).

**V.     CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Defendant Patrick Sherwood's motion for summary judgment (ECF No. 35) is granted on Plaintiff's Fourth Amendment excessive force claim.

The Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED THIS 6th day of January 2020.

    _____
    MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE